# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| HOPE A. WAFFLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:14-cv-00322-SLC |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, *sued as Carolyn W. Colvin,* | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Hope A. Waffle appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[1] (*See* DE 1). For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order.

## I. PROCEDURAL HISTORY

Waffle applied for DIB and SSI in March 2012, alleging disability as of July 6, 2009. (DE 10 Administrative Record ("AR") 11, 146, 156). The Commissioner denied her applications initially and upon reconsideration. (AR 80, 84, 94, 101). Waffle requested a hearing before an Administrative Law Judge (AR 108), and Administrative Law Judge Patricia Melvin ("the ALJ") held a hearing on May 1, 2013, at which Waffle was represented by counsel (AR 33). On June 17, 2013, the ALJ issued an unfavorable decision, finding that Waffle was not disabled because

---

[1] All parties have consented to the Magistrate Judge. (DE 16); *see* 28 U.S.C. § 636(c).

she was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. (AR 18-19). Waffle requested the Appeals Council review the ALJ's decision (AR 6-7), and the Appeals Council denied Waffle's request, making the ALJ's decision the final, appealable decision of the Commissioner (AR 1-4).

Waffle filed a complaint with this Court on October 15, 2014, seeking relief from the Commissioner's final decision. (DE 1). In this appeal, Waffle alleges that the ALJ erred by: (1) improperly evaluating Waffle's mental limitations; (2) failing to include limitations in the hypothetical questions posed to the vocational examiner that sufficiently described Waffle's mental limitations and her ability to work for a full 40-hour work week; (3) improperly evaluating Waffle's credibility; and (4) failing to give proper weight to the opinions of Waffle's treating and examining physicians. (DE 19 at 6-15).

## II. FACTUAL BACKGROUND[2]

### A. Background

At the time of the ALJ's decision, Waffle was 46 years old. (AR 36). She has an eighth-grade education, which included special education classes. (AR 37, 204). Her employment history includes work as a manager of a Subway restaurant from 1996 through 2006, and part-time work as a waitress at a Pizza Forum restaurant from 2011 to present. (AR 38-39, 204).

### B. Waffle's Testimony at the Hearing

At the hearing, Waffle testified that she lived with her 13-year-old son in an apartment. (AR 36). She is divorced. (AR 36). Waffle is five feet, four inches tall and weighs 180 pounds.

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 840-page administrative record necessary to the decision.

(AR 36). She explained that she had gained about 10 pounds in the last few weeks before the hearing, which she attributed to not doing much at home. (AR 36). Waffle left school after the eighth grade, and she is able to read slowly and do basic math, but she has trouble spelling. (AR 37).

Waffle receives child support and food stamps; she gets health insurance through the Healthy Indiana Plan; and she works part time at the Pizza Forum restaurant, where she waits tables and delivers pizza. (AR 38). She works about nine hours per week, and although she has worked more hours per week in the past, she has never worked more than 20 hours per week at Pizza Forum. (AR 38). Waffle carries drinks and plates of food to customers at their tables; she can carry one plate at a time, and she can carry a round tray with three cups on it when she uses two hands. (AR 39). She estimates that the tray with drinks weighs maybe two pounds. (AR 39).

When Waffle worked at Subway, she was initially just an employee for the first year. (AR 39). When she was an employee, she made sandwiches; closed the restaurant; worked split shifts to cover the lunch rush; swept the floors; mopped; and did dishes. (AR 39). When she was an employee, she estimated that she would lift maybe five or ten pounds at a time. (AR 39). When she became the manager of Subway, she had to put the food away that was unloaded from the delivery trucks. (AR 40). The containers of food weighed up to 50 pounds. (AR 40). As the manager, Waffle was working up to 45 hours per week. (AR 40).

Waffle left work at Subway in 1999 and briefly worked at Dairy Queen for a few months. (AR 41-42). She stopped working at Subway because she had just had a baby and the restaurant

had gone under new management, which made her nervous. (AR 42). She returned to Subway later in 1999 because they asked her to come back. (AR 42). She was later fired from Subway due to sales, labor, and food costs. (AR 42). Waffle has looked for full-time work as a cashier since she stopped working for Subway. (AR 42).

In Waffle's opinion, the most severe problem she has that is causing her to be unable to work is her neck and shoulder pain. (AR 43). She has a bulging disc in her neck and a tear in her rotator cuff, which causes her to be in pain all of the time. (AR 43). Waffle was in pain while sitting in the hearing. (AR 43). Her shoulder and neck first started hurting in 2009, when she tore her rotator cuff. (AR 43). Her pain is in the back of her neck down into her shoulder and shoulder blade. (AR 43-44). She has constant pain in both her neck and shoulder, which she rates as a five on a scale of 10. (AR 44).

Waffle has had about 13 injection treatments, and she has also had three surgeries on her shoulder, one surgery on her elbow, and one surgery on her wrist. (AR 44). She takes Lortab and Mobic for her pain. (AR 44). She takes her pain medication before she goes to work and again when she gets home from work. (AR 44). The pain medication helps her somewhat; her pain is a three out of 10 while she is working if she takes her pain medication. (AR 45). If she works three days in a row, her pain goes up to an eight out of 10. (AR 45). Moving around makes her neck and shoulder pain worse. (AR 46). She has gone to physical therapy, but it made her hurt more. (AR 46). Lying down to take the pressure off her neck and reclining in her chair also help with her pain. (AR 46).

Waffle's next biggest impairment is with lifting. (AR 47). Lifting hurts her neck and her

arms.  (AR 47).  She cannot lift very much; she cannot lift a gallon of milk to pour it.  (AR 48).

Even just making the motion of pouring a gallon of milk during the hearing hurt her arm to turn

it inward.  (AR 48).  She can pick up something if it is beside her, but she cannot pick it up if it is

away from her.  (AR 48).  Waffle also has tingling and numbness in her fingers, which is caused

by her neck.  (AR 48).  She has tingling in her fingers about three or four times everyday, but it

does not last all day.  (AR 48).  When she tries to use her hand, such as when she is trying to cut

pizza, it causes pain in her two last fingers.  (AR 49).  The pain in her fingers sometimes lasts all

day, and Waffle estimated the pain to be a four out of 10.  (AR 49).  Waffle also has problems

with her strength, caused by her neck and shoulder.  (AR 49).  She has lost the strength in her

arm; she can no longer grip like she used to.  (AR 49).  She cannot open things without using a

gripper.  (AR 49).

Waffle also has a learning disability, which causes her problems with spelling, reading,

and math.  (AR 49-50).  She was first diagnosed as learning disabled in first grade.  (AR 50).

She was in special education classes for all her academic subjects, but she took regular elective

classes like gym and home economics.  (AR 50).  Waffle did not think her learning disability

affected her work at Dairy Queen because she did not have to do anything at Dairy Queen.  (AR

50).  Her learning disability did affect her work at Subway, however, because she had a hard time

spelling.  (AR 50).  She would have to call a family member for help with spelling, such as when

she had to write up an employee or post notes.  (AR 50).  When she had to take tests, her son

would download the test so that Waffle could listen to the questions in order to take the test.

(AR 50).  At the pizza restaurant, Waffle explained that the owner overlooks her inability to spell

street addresses or customer names for delivery orders.  (AR 50-51).  She sometimes has a hard time delivering pizzas if she does not know where she is going, because she does not know how to read maps.  (AR 51).  The owner of the restaurant will help Waffle by telling her how to get to the delivery location.  (AR 51).  Waffle can read some of the street signs, but not all of them.  (AR 51).

Waffle stated that she does not think she has any problems that keep her from being able to work.  (AR 51).  Waffle explained that she can walk for a few blocks; she can stand for a half an hour at a time; she can sit for one to two hours before needing to lie down; she can lift 25 pounds when she uses both hands; she can lift five pounds with just her right hand; she can lift 10 pounds with just her left hand; she is right handed; she can push and pull some with her arms, although she cannot move her furniture; she can reach overhead with her left arm but not her right; she can grip things like silverware, cups, glasses, doorknobs, and a steering wheel with her hands, but she cannot open things; she can use her fingers to fasten buttons, zippers, and shoelaces; she can feel with her fingertips; she can push a pedal with her legs; she can climb stairs, but not a lot of stairs; she can bend over and touch her knees and her toes; she has no problems with balance; she can get herself dressed; she can get in and out of the shower by herself; she has a driver's license; she took the written version of the driver's license test; she drives everyday that she goes to work; she drives for 20 miles in a trip.  (AR 51-54).

She does the cooking for her household; she shops with her son; she does the dishes; she washes the laundry; her son folds the towels but she folds everything else; she changes and makes the beds; she does the vacuuming; she does the rest of the housework, such as scrubbing

the bathrooms and kitchen; her son takes out the garbage and does the yard work.  (AR 54-55).

Waffle takes Mobic and Lortab, as well as Crestor and a depression medicine, but she had not

taken the depression medication for over a month at the time of the hearing because she ran out

of refills.  (AR 55-56).

An average day for Waffle consists of getting up out of bed; sitting and watching the

news before going to work; working for three hours; then coming home and sitting in her

recliner; when she starts hurting, she lies on the floor with a few pillows; when she feels better,

she gets up and fixes her son something to eat; then she watches television.  (AR 56).  When she

watches television, she sometimes sits, sometimes reclines, and sometimes gets on the floor.

(AR 56).  When she lies on the floor, it helps to relieve the pressure and pain.  (AR 56-57).  She

lies on the floor for a half hour or so every couple hours.  (AR 57).  She reclines in her chair

every couple of hours, maybe four or five times per day, for one to two hours at a time.  (AR 57).

Waffle has difficulty putting her right arm onto the table, because it causes pain including

in her elbow.  (AR 58).  To relax, she has to put her arm into her lap.  (AR 58).  Her job at the

Pizza Forum permits her to sit down when she is not waiting tables.  (AR 58).  She is able to take

some time to rest her hands, and she is able to alternate between standing, walking, and sitting.

(AR 58).   She does not have to lift anything above five pounds.  (AR 58).  Her doctor currently

has her restricted to working three hours per day; if she tried to work longer than that, she would

be in more pain.  (AR 59).  Sometimes the pain makes her cry.  (AR 59).  Waffle cries just about

every day.  (AR 59).  Her doctor also added a limitation that she cannot use anything that

vibrates.  (AR 59).

Since Waffle was injured lifting five gallon syrup bags, which weighed 45 to 50 pounds, she has lost her independence.  (AR 59-60).  She does not get out with people as much and she does not talk to her mom.  (AR 59-60).  While she is able to drive, she drives with her left hand and just holds her right hand at the bottom of the steering wheel, with her thumb.  (AR 65).  She cannot keep her right hand at the top of the steering wheel.  (AR 65).  She cannot bathe in a bathtub because she cannot use her right arm to lift herself up to get out of the tub.  (AR 65).  When she vacuums and cleans the house, she vacuums with both hands, and she paces herself.  (AR 65-66).  She used to be able to clean the house in a couple of hours, but now it takes her all day, because she has to keep stopping.  (AR 66).[3]

## C.  Summary of the Relevant Medical Evidence

Waffle claims that she became disabled on July 6, 2009, due to the combination of the bulging discs in her neck, a tear in her right shoulder rotator cuff, her right cubital tunnel and recurrent carpel tunnel syndrome, and her depression.  (DE 19 at 2).  Although Waffle claims to be disabled, she has continued to work, although at a reduced rate.  (DE 19 at 2).

Waffle has an eighth grade education, which included special education classes.  (AR 204).  Waffle was exempted from standardized testing, but in seventh grade, she placed in the second percentile for reading and the fourth percentile for math.  (AR 285).  Waffle has difficulty with basic math and reading, and her daughter had to complete some of Waffle's disability application forms.  (AR 238, 266).

On July 7, 2009, Waffle presented to the RediMed Dekalb Clinic complaining of pain in

---

[3] Waffle's mother and daughter also testified at the hearing, essentially corroborating Waffle's testimony.  (AR 61-65).

her right shoulder, which she reported had started the previous day. (AR 370-72). Waffle was permitted to return to work, but she was limited to lifting no more than 10 pounds and nothing above mid-chest level. (AR 372). Waffle returned to RediMed throughout July, August, and September 2009; she was diagnosed with a rotator cuff strain and underwent physical therapy but saw no improvement. (AR 322-68). Waffle underwent an MRI on August 20, 2009, which revealed "[m]ild AC joint degenerative change and tendinosis of the rotator cuff without rotator cuff tear." (AR 326).

On October 9, 2009, Waffle was seen by Dr. Gregory M. Sassmannshausen at Fort Wayne Orthopaedics for an evaluation through workers' compensation. (AR 419). Waffle complained of right anterolateral shoulder pain, which she stated began bothering her on July 6, 2009, when she was carrying a bag of syrup at Subway while working. (AR 419). Dr. Sassmannshausen noted that Waffle had reported worsening symptoms after a course of physical therapy and no significant improvement from two subacromial injections. (AR 419). Waffle reported that she had since lost her job for reasons unrelated to her work injury. (AR 419). Waffle stated that her pain level was a five out of 10, and her pain was worse when reaching to the side or overhead. (AR 419). He found that her neck had straight full range of motion; no evidence of asymmetry in her right shoulder; active forward flexion 0 to 130 degrees; internal rotation to T10; negative acromioclavicular joint tenderness but positive greater tuberosity tenderness; markedly positive Neer and Hawkins impingement signs; pain produced by drop arm test; 5/5 strength abduction, external rotation; and she was neurovascularly intact. (AR 420). He diagnosed Waffle with right shoulder chronic impingement syndrome, and he noted that he had

"nothing further to offer her nonoperatively," as she "had persistent symptoms for over three months despite activity modification, oral medicines, injections and therapy." (AR 420). Dr. Sassmannshausen recommended shoulder arthroscopy with subacromial decompression, and Waffle desired to proceed with the surgery pending approval by workers' compensation. (AR 420).

Dr. Sassmannshausen performed surgery on Waffle's shoulder on October 15, 2009. (AR 631-32). He prescribed Vicodin to Waffle and instructed her to also take ibuprofen for her post-surgery pain. (AR 632). Waffle participated in physical therapy after her surgery, but she continued to have pain and functional problems. (AR 583-628). On February 12, 2010, Dr. Sassmannshausen noted that Waffle was still reporting that her shoulder was sore, and Waffle was also complaining that her arm was going to sleep regularly. (AR 404). Dr. Sassmannshausen recommended an EMG to determine the cause of the numbness, and he continued the work restrictions limiting Waffle to lifting no more than two or three pounds and only occasional reaching above shoulder level. (AR 404).

Dr. Mark Zolman performed an EMG on Waffle on February 24, 2010, which revealed electrophysiologic evidence consistent with mild right ulnar neuropathy at the elbow (cubital tunnel syndrome) and mild right median neuropathy at the wrist (carpal tunnel syndrome). (AR 373).

On March 9, 2010, Dr. Mark Reecer saw Waffle for a functional capacity evaluation. (AR 386). Dr. Reecer found that Waffle had a 9.4% functional strength deficit, and he opined that she could lift from floor to waist 60 pounds maximum, 50 pounds occasionally, 25 pounds

frequently, and 15 pounds constantly; could lift overhead 25 pounds maximum, 25 pounds occasionally, 15 pounds frequently, and 12 pounds constantly; could two-hand carry 50 pounds maximum, 50 pounds occasionally, 40 pounds frequently, and 30 pounds constantly; could crawl only occasionally; was limited to light medium qualification of her right arm controls; and had a 5% upper extremity impairment above the elbow and a 3% whole person impairment.  (AR 386).

Waffle presented to Dr. David Ringel on April 12, 2010, for a second opinion regarding her permanent partial impairment ("PPI") rating for workers' compensation.  (AR 753).  Dr. Ringel opined that Waffle's right arm had a 35% PPI and that her total body PPI was 10%.  (AR 755).

Waffle next presented to Dr. Sassmannshausen on November 15, 2010.  (AR 400).  Dr. Sassmannshausen noted that Waffle continued to complain of neck pain and pain radiating down her arm and into her hand, with numbness and tingling in her fingers.  (AR 400).  Dr. Sassmannshausen examined Waffle and found that she had mild midline cervical tenderness, some trapezial tenderness on the right, negative AC tenderness of the right shoulder, negative impingement signs, diffuse discomfort over the anterior and posterior joint lines of the shoulder, and full grip strength.  (AR 400).  Dr. Sassmannshausen also reviewed Waffle's shoulder arthroscopy photos, which showed no significant structural damage.  (AR 400).  Because he was concerned about her neck, Dr. Sassmannshausen ordered an MRI of Waffle's cervical spine.  (AR 400).

Waffle underwent an MRI of her cervical spine on November 18, 2010.  (AR 407).  Dr. Steven Marchioni reviewed the scans and found that there was disc desiccation throughout the

cervical spine; no significant disc abnormality demonstrated at C2-3, C3-4, C4-5, and C5-6; a small diffuse disc bulge at C6-7, but this did not create significant central canal stenosis or significant neuroforaminal narrowing; C7-T1 was within normal limits; marrow signal had an appearance within normal limits; the cervical cord demonstrated normal signal and morphology; and no abnormality involving the portion of the posterior fossa was visualized.  (DE 407-08).

Waffle returned to Fort Wayne Orthopaedics on November 30, 2010, when she was seen by Dr. Kevin Rahn.  (AR 401-02).  Dr. Rahn examined Waffle and found her to have normal range of motion in her neck; 50/50 neck pain to arm pain ratio; a current pain level of four on a scale of 10; pain of nine out of 10 on her worst day; normal range of motion in her left shoulder; increasing range of motion anteriorly in her right shoulder; and significant shoulder pain caused by internal rotation of the right shoulder.  (AR 401-02).  Dr. Rahn noted that Waffle had a positive Spurling's maneuver, increasing paresthesias and pain in her shoulder, with no strength weakness, but with decreased sensation in the fourth and fifth digits of her hand.  (AR 402).  Dr. Rahn diagnosed Waffle with stenosis at C6-C7, disc space bulging, and mild C5-C6 stenosis, and he recommended an epidural injection at the C7 nerve root block on the right.  (AR 402).

Waffle presented to Dr. Gregory Hoffman at ONE Ortho Northeast on March 4, 2011, complaining of paresthesias in her right fourth and fifth digits, inferior right arm radiculopathy, superior trapezial pain, neck pain, and parascapular pain.  (AR 705).  Dr. Hoffman examined Waffle and found her to be non-tender to palpation of the cervical spine and parascapular region; 5/5 muscle strength for deltoids, biceps, radial wrist extensors, pronators, and triceps bilaterally; finger abduction, pincer grasp, and grip strength equal bilaterally; reflexes for C5, C6, and C7

were 2+ in the bilateral upper extremities; a positive Spurling's test on the right for parascapular pain; a positive Tinels over the right elbow; and painful range of motion for the right shoulder. (AR 705). Dr. Hoffman ordered X-rays of Waffle's cervical spine that day and reviewed them, finding severe sponylosis at C6 and C7; decreased disc space at C6-C7; but no other abnormalities and no right sided stenosis. (AR 706). Dr. Hoffman gave Waffle a cortisone injection in her right shoulder and referred her to see Dr. Christopher LaSalle for evaluation of the right ulnar nerve and to Dr. Rebecca Posner for pain management and a right C7 injection. (AR 706). Dr. Hoffman noted that despite the degenerative disc disease at C6-7, there was no significant pathology such that Waffle would benefit from surgical intervention. (AR 706). Dr. Hoffman prescribed Vicodin to Waffle to help manage her pain. (AR 706).

Dr. LaSalle saw Waffle on March 8, 2011. (AR 702-04). He examined her and diagnosed her with an ulnar nerve palsy/lesion and cervical pain with right upper extremity radiculopathy. (AR 703-04).

Waffle presented to Dr. Jon Karl on March 28, 2011, complaining of right neck pain, which radiated into her right arm. (AR 427). Dr. Karl noted that Waffle had undergone surgery to repair her rotator cuff tear, had tried medications, and had undergone physical therapy, but nothing provided relief. (AR 427). Dr. Karl assessed Waffle as having the signs and symptoms of a right cervical radiculitis secondary to C6-7 degenerative disc, and he planned to perform a cervical epidural steroid injection. (AR 428).

On May 6, 2011, Waffle had a third occipital nerve C3-5 diagnostic medial branch block. (AR 698). On May 17, 2011, she presented to Dr. Karl for a followup visit. Waffle reported dull

13

and achy pain on the right side of her neck, which she rated as a four or five out of 10. (AR 698). Waffle reported that the medial branch block and other treatments had not given relief, and that the diagnostic medial branch block had exacerbated her pain. (AR 698). Upon examination, Dr. Karl found that Waffle had a decreased grip squeeze in her right hand and a limited range of motion in her right upper extremity due to pain. (AR 699). Dr. Karl discussed a right side C7-T1 cervical epidural with Waffle, and he prescribed Percocet to her for the pain. (AR 699). On May 31, 2011, Dr. Karl performed the right C7-T1 interlaminar cervical epidural steroid injection. (AR 424-26).

Waffle had another appointment with Dr. Karl on June 14, 2011, as a followup for the injection. Waffle reported having dull and achy pain in her neck and down into her arm, which she rated as an eight out of 10, and which she stated occurred all the time. (AR 695). Upon examination, Dr. Karl found Waffle's motor function for her upper extremity normal for the radial, ulnar, and median nerves; her sensory function in her upper extremity grossly intact; her gait normal; diffuse right tenderness in her trapezius rhomboids; and limited spine flexion and extension due to cervical pain. (AR 696). Dr. Karl diagnosed Waffle with ulnar nerve palsy/lesion, with possible thoracic outlet syndrome, shoulder pain, cervical pain with right upper extremity radiculopathy, and cervical spondylosis. (AR 696). He prescribed Percocet, Robaxin, and physical therapy. (AR 696).

Waffle underwent a CT scan on June 21, 2011. (AR 711). Dr. Marchioni reviewed the scan and gave his impression that Waffle had some moderate paraseptal emphysema involving the lung apices bilaterally and a lesser degree of paraseptal emphysema throughout the remainder

of the lungs, as well as disc degenerative changes throughout the thoracic spine, but all other areas were within normal limits.  (AR 711).

Waffle reported to Dr. Karl for an appointment on July 12, 2011.  (AR 692).  At this appointment, Waffle's complaints remained the same.  (AR 692).  Dr. Karl prescribed Vicodin, Lyrica, and Ambien for Waffle.  (AR 693).  Waffle returned to Dr. Karl's office on August 4, 2011, complaining of sharp pain, which she rated as an eight out of 10 and reported occurring all of the time.  (AR 689).  Waffle also requested that she see Dr. LaSalle again regarding her wrist and elbow.  (AR 689).  Dr. Karl performed a trigger point cortisone injection in Waffle's right trapezium and prescribed Ambien and Lortab.  (AR 691).

Waffle saw Dr. LaSalle for an appointment on August 23, 2011, for a reevaluation of her right shoulder and upper extremity pain.  (AR 688).  Waffle complained of 90% constant numbness and tingling into the ring and small fingers with intermittent numbness and tingling in her thumb through middle finger.  (AR 688).  Upon examination, Dr. LaSalle found that Waffle was neurovascularly intact with full range of motion present, both active and passive; had a 5/5 strength test in forward elevation, abduction, and external resistence; had a positive Tinel and a positive compression test at the right elbow over the ulnar nerve; had a positive Tinel and compression test over the wrist median nerve; had positive Hawkins at the right shoulder; had positive empty can at the right shoulder; and had positive tenderness to palpation along the supraspinatus insertion point.  (AR 688).  Dr. LaSalle diagnosed Waffle with right upper extremity pain, probable cubital tunnel syndrome, possible carpal tunnel syndrome, and probable right shoulder tendinitis, rotator cuff.  (AR 688).  He ordered an EMG study with Dr. Shantanu

Kulkami due to Waffle's nearly constant numbness and tingling in her fingers.  (AR 688).

Waffle underwent the EMG study with Dr. Kulkami on September 21, 2011.  (AR 707-10).  When she reported to Dr. Kulkami, Waffle complained of having throbbing and achy pain on her right side all of the time, and she rated her pain as a six out of 10.  (AR 685).  The EMG study was normal, with no electrodiagnostic evidence of right cervical radiculopathy, right ulnar neuropathy, or right brachial plexopathy.  (AR 686).  The EMG did provide electrodiagnostic evidence for right median neuropathy, mild at her wrist.  (AR 686).  Dr. Kulkami diagnosed Waffle with cervical spondylosis and mild right carpal tunnel syndrome, and he directed her to follow up with Dr. LaSalle.  (AR 686).

On September 22, 2011, Waffle returned to Dr. LaSalle to discuss the results of the EMG study.  (AR 682).  Dr. LaSalle diagnosed Waffle with right carpal tunnel syndrome and right cubital tunnel syndrome, and he discussed surgery and non-operative treatments with her.  (AR 684).  Waffle elected to proceed with right elbow ulnar nerve transposition surgery and a right wrist carpal tunnel release.  (AR 684).

On October 14, 2011, Waffle underwent surgery; Dr. LaSalle performed a re-release of her right carpal tunnel and an anterior nerve transposition.  (AR 679-80).  She reported back to Dr. LaSalle on October 24, 2011 for a followup appointment, and he noted that Waffle had been doing well overall, was neurovascularly intact, and her wound looked good.  (AR 677).  Dr. LaSalle directed Waffle to start working on her range of motion.  (AR 677).  Waffle returned to Dr. LaSalle on November 21, 2011, complaining of significant burning-type pain in her forearm.  (AR 676).  Dr. LaSalle wrote that the pain was out of proportion to what she should be having.  (AR 676).  Dr. LaSalle directed Waffle to followup with PainONE for therapy in a

desensitization program. (AR 676).

On December 20, 2011, Waffle reported to Dr. Karl, complaining of pain in her right neck, elbow, and shoulder, which she rated as a six out of 10. (AR 673). Dr. Karl examined Waffle and found that motor function in her upper extremity was normal to the radial, ulnar, and median nerves; sensory function in her upper extremity was grossly intact; reflexes in her upper extremity were normal in the biceps, triceps, and brachioradialis; her gait was normal; her right upper extremity had Tinels at the wrist; her left upper extremity was non-tender and had full range of motion with no crepitus; and her spine rotation was limited with cervical pain, but Spurling was negative. (AR 674). Dr. Karl recommended that Waffle continue physical therapy and advised against bed rest. (AR 674). He prescribed Lortab and Neurontin. (AR 674).

On January 27, 2012, Waffle presented to Kristina Leavell, PA-C, who was supervised by Dr. Scott Armstrong, for a followup after a breast biopsy. (AR 448). Waffle reported having a hard time with her mood. (AR 448). Ms. Leavell noted that Waffle's depressed mood had been ongoing for a few months. (AR 448). Ms. Leavell found that Waffle was oriented to person, place, and time; had normal speech; had intact recent and remote memory, and had appropriate intellectual functioning. (AR 449). Ms. Leavell diagnosed Waffle with depressive disorder and wrote that she would consider prescribing Waffle an SSRI medication depending on her lab results. (AR 449).

On February 6, 2012, Waffle had another appointment with Ms. Leavell. (AR 446-47). Ms. Leavell noted that Waffle had a depressed mood, although she was oriented to person, place, and time; had normal speech; had intact recent and remote memory; and had appropriate intellectual functioning. (AR 446). Ms. Leavell prescribed Crestor and Celexa to Waffle. (AR

17

447).

Waffle returned for an appointment with Dr. Karl on February 14, 2012, to reevaluate the shoulder impingement and ulnar nerve palsy/lesion. (AR 669). Waffle reported achy pain on her right side that occurred all the time, and she rated her pain as a three out of 10. (AR 669). Upon examination, Dr. Karl found Waffle's motor function in her upper extremity normal to the radial, ulnar, and median nerves; sensory function in her upper extremity grossly intact; reflexes in her upper extremity normal for the biceps, triceps, and brachioradialis; gait normal; Tinels in her right wrist; left upper extremity non-tender with full range of motion with no crepitus; and spine rotation limited with cervical pain, but Spurling was negative. (AR 670). Dr. Karl discussed the option of performing a right stellate ganglion block in the future, and he prescribed capsaicin, Neurontin, Nabumetone, and Flexeril. (AR 670). He also wrote a work note for Waffle, permitting her to return to work, but with modified duties for six weeks. (AR 670). Dr. Karl limited Waffle to three hours of work per day, and instructed that she could not lift or carry more than 10 pounds. (AR 670-71). He stated that she could occasionally carry up to 10 pounds, climb, work above shoulder level, push and pull objects, work with vibratory tools, and perform repetitive motions. (AR 671). Dr. Karl directed Waffle to continue physical therapy. (AR 671).

Waffle's next appointment with Dr. Karl was March 27, 2012. (AR 663). Waffle complained of achy pain on her right side that occurred all of the time, which she rated as a five out of 10. (AR 663). Waffle reported that the capsaicin cream did not help, the Neurontin gave her headaches, and the Lortab was the most effective. (AR 663). Waffle's physical examination by Dr. Karl was unchanged from her previous appointment. (AR 664). Dr. Karl directed Waffle

to continue using her TENS unit, and to continue using the Tylenol cream on her right forearm. (AR 664).  He renewed Waffle's Lortab prescription.  (AR 664).

On April 2, 2012, Waffle had an appointment with Ms. Leavell, for a followup after having had blood work done the previous day.  (AR 748).  Waffle reported that "[o]therwise she is feeling fine."  (AR 748).  Ms. Leavell examined Waffle and found that she did not appear to be in distress; was oriented to person, place, and time; had intact recent and remote memory; had intact judgment and insight; had normal mood and affect; and had no suicidal or homicidal thoughts or ideation.  (AR 748).

On June 4, 2012, Dr. Wayne Von Bargen, a clinical psychologist, conducted a mental status examination of Waffle.  (AR 756).  Dr. Von Bargen found Waffle to be adequately groomed; cooperative during the examination; logical, relevant, and coherent in her verbalizations; slightly irritable and dysphoric in her affect; and normal in both alertness and activity level.  (AR 756).  Waffle reported feeling anxious and like she wanted to cry and stay away from people.  (AR 756).  Waffle stated that she had not gone to any counseling or psychotherapy, and she had never been psychiatrically hospitalized.  (AR 756).  Dr. Von Bargen wrote that Waffle knew the month, day, date, and year; her present location; the colors of the American flag; the number of months and weeks in a year; and the name of the current president. (AR 757).  Waffle was able to explain the meaning of proverbs; discuss the similarities and differences between items; correctly repeat five digits forward and three digits backward; quickly and correctly perform simple arithmetic calculations; and recall items from memory after a delay. (AR 757).  Dr. Von Bargen found that Waffle's history and current presentation during the

examination suggested the likelihood of depression of mild severity, secondary to her medical difficulties and current limitations. (AR 757). Dr. Von Bargen noted that Waffle reported having some success with the medications she was currently taking to improve her depression, although she continued to experience periods of dysphoria, crying, and social withdrawal. (AR 757). Dr. Von Bargen found that Waffle was able to adequately care for herself and perform routine daily activities, although she reported some limitation in performing strenuous and prolonged tasks. (AR 757). Dr. Von Bargen opined that Waffle's cognitive functioning was grossly intact and that she was capable of managing her own funds. (AR 757). Dr. Von Bargen diagnosed Waffle with dysthemic disorder. (AR 757).

On June 6, 2012, Dr. Ken Lovko, a state agency psychologist, reviewed the record and opined that Waffle's mental impairments were not severe. (AR 759, 771). A second state agency psychologist, Dr. B. Randal Horton, later reviewed the record and affirmed Dr. Lovko's assessment. (AR 789).

Also on June 6, 2012, Waffle was evaluated by Dr. David Ringel for a disability determination. (AR 773). Dr. Ringel examined Waffle and found that she was a well-developed, well-nourished female in no acute distress with completely normal ambulation; no trouble getting on or off the exam table; no trouble getting up and out of the chair; being able to dress and undress as needed for the examination; having completely normal hearing for conversation and 100% understandable speech. (AR 774). In examining Waffle's spine and extremities, Dr. Ringel found that her pulses and reflexes were 2/4 bilaterally; she had no swelling, cyanosis, clubbing or edema; her gait was completely normal; she used no assistive devices; her grip

strength was 5/5 bilaterally; she had good thumb/finger apposition on both hands; she could button buttons and zip zippers without difficulty; she had spasms in her back bilaterally from the thoracic into the lumbar area; she had pain in the right upper thoracic spinal segments into her right shoulder area; she had distinctly decreased range of motion in the right upper extremity; and she had decreased range of motion in the cervical and lumbar spinal segments as well as in the hips bilaterally; she was able to lie straight back on the table and get on and off the table; she could get up onto her toes and take steps; she could get up onto her heels but could not take steps; and she performed a full squat without difficulty. (AR 775). As to Waffle's neurologic examination, Dr. Ringel wrote that her mentation was intact and appropriate during the examination without abnormality; her motor strength was 5/5 in all proximal muscle groups in all four extremities; her sensory functioning was intact in all four extremities, and her cranial nerves II-XII were grossly intact. (AR 775).

On June 18, 2012, Dr. M. Brill reviewed the record and completed a physical residual functional capacity ("RFC") assessment for Waffle. He found that Waffle could occasionally lift and/or carry 20 pounds; could frequently lift and/or carry 10 pounds; could stand and/or walk, with normal breaks, for a total of about six hours in an eight-hour workday; could sit, with normal breaks, for about six hours in an eight-hour workday; and had no limitations on her ability to push and/or pull, other than as specified for lifting and carrying. (AR 778). Dr. Brill opined that Waffle could occasionally climb ramps and stairs but never climb ladders, ropes, and scaffolds. (AR 779). He further opined that she could occasionally balance, stoop, kneel, crouch, and crawl. (AR 779). Dr. Brill found that Waffle was not limited in her handling,

fingering, and feeling, but she was limited in her reaching to only occasional bilateral overhead reaching. (AR 780). Dr. Brill wrote that Waffle had no visual, communicative, or environmental limitations. (AR 780-81). Dr. Fernando Montoya, a second state agency physician, later reviewed the record and affirmed Dr. Brill's assessment. (AR 790).

On February 19, 2013, in response to a written question from Waffle's disability attorney regarding her limitations, Dr. Karl stated that Waffle should not work with vibratory tools, but otherwise his February 14, 2012, opinion regarding her limitations remained unchanged: that she was limited to 3 hours of work per day; should not lift more than 10 pounds; and could occasionally carry up to 10 pounds, climb, work above shoulder level, push and pull objects, and perform repetitive motion. (AR 793).

On April 3, 2014, after a gap of two years in the treatment notes in the record, Waffle returned to see Dr. Karl for reevaluation of the thoracic degenerative disc disease, dorsal arthritis, and fibromyalgia/fibromyositis. (AR 837). Dr. Karl listed Waffle's health history, family history, and previous procedures. (AR 837-38). He then wrote a letter stating that Waffle's "job was causing increasing severe pain in her left shoulder" and that it was "medically necessary that she no longer perform[] this job." (AR 839). This evidence was submitted for the first time to the Appeals Council (AR 836), and therefore was not before the ALJ at the time of the decision.

## III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42

U.S.C. § 405(g); *see* 42 U.S.C. § 1383(c)(3).  The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Id.*  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

### IV.  ANALYSIS

*A.  The Law*

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

In determining whether Waffle is disabled as defined by the Act, the ALJ conducted the

familiar five-step analytical process, which required her to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[4]  *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920.  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled.  *Id.*  The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner.  *Id.* at 885-86.

### B.  The ALJ's Decision

On June 17, 2013, the ALJ issued the decision that ultimately became the Commissioner's final decision.  (AR 11-20).  At step one, the ALJ found that although Waffle worked after her alleged onset date, this work activity did not rise to the level of substantial gainful activity and Waffle had not engaged in any substantial activity since July 6, 2009, the alleged onset date.  (AR 13).  At step two, the ALJ found that Waffle had the following severe impairments: right shoulder injury; right wrist, ulnar nerve entrapment; right carpal tunnel

---

[4] Before performing steps four and five, the ALJ must determine the claimant's RFC, or what tasks the claimant can do despite her limitations.  20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of.  20 C.F.R. §§ 404.1520(e), 404.945(a)(5), 416.920(e), 416.945(a)(5).

syndrome; small diffuse disc bulge at C6-7; and degenerative disc disease of the thoracic spine.

(AR 14).  At step three, the ALJ found that Waffle did not have an impairment or combination of

impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404,

Subpart P, Appendix 1.  (AR 15).

Before proceeding to step four, the ALJ determined that Waffle had the following RFC:

the claimant has the [RFC] to perform light work . . . except she can occasionally
climb ramps and stairs, never climb ladders, ropes and scaffolds, and occasionally
balance, stoop, kneel, crouch or crawl.  The claimant is limited to occasional
overhead reaching bilaterally.

(AR 16).

At step four, the ALJ considered this RFC and the VE's testimony before finding that

Waffle's limitations would preclude her from performing her past relevant work as a waitress

and restaurant manager.  (AR 18).  The ALJ then concluded at step five that Waffle could

perform a significant number of light work jobs in the economy, including small products

assembler, laundry folder, and electronics worker.  (AR 18-19).  Accordingly, the ALJ

determined that Waffle was not disabled from July 6, 2009, the alleged onset date, through June

17, 2013, the date of the ALJ's decision; Waffle's claims for DIB and SSI were therefore denied.

(AR 19-20).

### C.  The ALJ's Failure to Consider All of Waffle's
### Limitations in Combination Requires Remand

Waffle's first argument is that the ALJ erred by improperly evaluating Waffle's mental

limitations.  Waffle makes the following arguments regarding the ALJ's consideration of her

mental limitations:  (1) that the ALJ erred in finding that her depression was not a severe

impairment at step two; (2) that the ALJ erred by failing to include limitations regarding her depression in the RFC, even if it was non-severe; (3) that the ALJ erred by finding that Waffle's learning disability was not a medically determinable severe impairment at step two; and (4) that the ALJ did not include mental limitations in the RFC related to Waffle's pain and any side effects from her pain medication.

The Court will first address Waffle's arguments regarding the ALJ's finding at step two that her depression and learning disability were not severe impairments. As discussed above, the ALJ conducts a five-step evaluation process under 20 C.F.R. §§ 404.1520 and 416.920. Step two of the process requires the ALJ to determine whether the claimant has a severe impairment. "Deciding whether impairments are severe at Step 2 is a threshold issue only; an ALJ must continue on to the remaining steps of the evaluation process as long as there exists even *one* severe impairment." *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012) (citing *Castile v. Astrue*, 617 F.3d 923, 927-28 (7th Cir. 2010)). Thus, "even if [an ALJ makes] a mistake at Step 2, it does not matter." *Id.* (finding any error by the ALJ in omitting impairments at step two to be harmless where the ALJ categorized two impairments as severe). Here, the ALJ's step two findings categorized many of Waffle's other impairments as severe. Thus, any mistake by the ALJ in failing to include Waffle's other impairments as severe impairments at step two does not matter. Waffle's arguments regarding the ALJ's consideration of her mental limitations therefore come down to whether the ALJ erred in assessing her RFC. *See id.*

Waffle argues that the ALJ erred in assessing her RFC by failing to include mental limitations in the RFC related to her depression and her pain. "An ALJ must evaluate all relevant

evidence when determining an applicant's RFC, including evidence of impairments that are not severe." *Id.* (citing 20 C.F.R. § 404.1545(a); *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008)). "An ALJ must also analyze a claimant's impairments in combination" when determining the RFC. *Id.* (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)). While an ALJ "need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion; in so doing, he may not ignore entire lines of contrary evidence." *Id.* (citations omitted).

This is a significant problem in the ALJ's analysis of Waffle's RFC. Not only does the ALJ fail to include any mental limitations in the RFC determination, the ALJ never even mentions Waffle's depression or the possibility of mental limitations caused by pain in the RFC analysis narrative. The ALJ instead references only Waffle's physical limitations and abilities. Waffle's medical records contain many references to her complaints of depressed mood, and she was prescribed medication for her depression. (AR 446-48, 748, 756-57). Waffle was diagnosed with dysthemic disorder by Dr. Von Bargen, the state agency's consultative psychological examiner. (AR 757). She was also diagnosed with depressive disorder by Ms. Leavell, a physician's assistant who treated Waffle under the supervision of Dr. Armstrong. (AR 446-49). Furthermore, Waffle's complaints of pain and side effects from medication were replete in the record. (AR 370, 400-02, 404, 419-20, 427, 583-628, 663-64, 669, 673-74, 676, 685, 688-89, 692, 695-96, 698-99, 703-06, 773).

The ALJ ignored Waffle's depression in the RFC analysis, and never discussed whether Waffle's pain and side effects from pain medication caused any mental limitations. Without any

discussion of whether the ALJ found that Waffle's depression and pain caused mental limitations that would affect her RFC, the Court has no idea what the ALJ thought about this evidence, which prevents the Court from carrying out a meaningful review.  *See Arnett*, 676 F.3d at 592 (citing *Clifford*, 227 F.3d at 873-74).  Accordingly, the Court will remand the case for thorough consideration of the combined effect of all of Waffle's impairments, both physical and mental, even those that are not severe in and of themselves.[5]

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order.  The Clerk is directed to enter a judgment in favor of Waffle and against the Commissioner.

SO ORDERED.

Entered this 26th day of September 2016.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge

---

[5] Because the Court finds that remand is necessary due to the ALJ's failure to consider the combined effect of Waffle's impairments—including those that are not severe on their own—when making the RFC determination, the Court need not address the remainder of Waffle's arguments for remand.  The Court is therefore making no determination regarding the validity of Waffle's remaining arguments; it may behoove the ALJ to address these arguments as well when issuing a revised decision.